**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL–CIO, et al., Plaintiffs,**

v.

**The UNITED STATES POSTAL SERVICE et al., Defendants.**

**Civ. A. No. 1755–71.**

United States District Court, District of Columbia.

Oct. 20, 1971.

Mozart G. Ratner, Donald Murtha, and Jules Bernstein, Washington, D. C., for plaintiffs.

L. Patrick Gray, III, Asst. Atty. Gen., Thomas A. Flannery, U. S. Atty., Harland F. Leathers, David J. Anderson, Stuart E. Schiffer, Attys., Dept. of Justice, for defendants.

### OPINION AND ORDER

CORCORAN, District Judge.

### I

This matter is before the Court on cross motions for summary judgment.

The plaintiffs are national labor organizations which represent for collective bargaining purposes approximately 650,000 postal employees throughout the United States.

The defendant Postal Service is an executive agency of the United States Government.

The defendant Winton M. Blount is the Postmaster General and the Chief Executive Officer of the Postal Service.

The defendant John P. Connally is Secretary of the Treasury and Chairman of the defendant Cost of Living Council which functions under Executive Order of the President.

### II

The salient facts which underlie this dispute follow.

(1) Congress enacted the Postal Reorganization Act, Public Law 91–375, 84 Stat. 719 (herein the PRA) on August 12, 1970. Section 2 of the PRA brought into being a new Title 39 to the U.S. Code and created the Postal Service as an executive agency of the United States. The Postal Service became operational July 1, 1971.

(2) Section 10 of the PRA, of key importance to this case, is a transitional provision not made part of the permanent law codified in Title 39.

By subsection (a) it authorized the Postal Service immediately to negotiate agreements with the plaintiffs "covering wages, hours, and working conditions" of postal employees without waiting for the Postal Service to become fully operative. 84 Stat. 784.

By subsection (b) it provided that any agreement negotiated under Section 10 should establish a wage schedule by which postal employees would "reach the maximum pay step for their respective labor grades after not more than 8 years of satisfactory service in such grades." 84 Stat. 785.

And by subsection (c) it provides that the Postmaster General shall establish wages, hours, and working conditions in accordance with the terms of any agreement or agreements made under this section notwithstanding the provisions of any law other than Title 39. 84 Stat. 785.

(3) Section 208 of the newly enacted Title 39 provides:

"Congress reserves the power to alter, amend, or repeal any or all of the sections of this title, but no such alteration, amendment, or repeal shall impair the obligation of any contract made by the Postal Service under any power conferred by this title." 39 U.S.C. § 208.

(4) Section 1208(b) of the newly enacted Title 39 vests the United

States District Courts with jurisdiction over "suits for violations of contracts between the Postal Service and a labor organization representing Postal Service employees" without respect to the amount in controversy. 39 U.S.C. § 1208(b).

(5) On November 18, 1970, by memorandum of agreement, plaintiffs and the Post Office Department reduced to eight years of satisfactory service the period for attaining the highest level of pay grade. This is the so-called "compression agreement."

(6) After having bargained collectively in accordance with the mandate of § 10(a), *supra*, plaintiffs and defendant Postal Service (operational on July 1, 1971) concluded a working agreement on July 20, 1971 which incorporated the November 18, 1970, "compression agreement," providing for accelerated in-grade advancement, and also provided for five separate wage increments of $250 per annum for all covered employees, to be effective, respectively, July 20, 1971, October 20, 1971, January 20, 1972, July 20, 1972, and January 20, 1973.

(7) On August 15, 1970, the President signed into law the Economic Stabilization Act of 1970, Pub.L. No. 91–379, 84 Stat. 799, which empowered the President "to issue such orders and regulations as he may deem appropriate to stabilize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970." Pub.L. No. 91–379, § 202. In May, 1971, this Act was extended through April 30, 1972. Pub. L. No. 92–15, 85 Stat. 38.

(8) Further on August 15, 1971, the President, purporting to exercise the powers delegated to him by Congress in the Economic Stabilization Act of 1970, issued Executive Order No. 11615. Section 1(a) of that Order directed that "prices, rents, wages and salaries" be stabilized for a period of 90 days from August 15, 1970 "at levels not greater than the highest of those pertaining to a substantial volume of actual transactions by each individual, business, firm or other entity of any kind during the 30-day period ending August 14, 1971, for like or similar commodities or services." Section 2(a) established the defendant "Cost of Living Council" [hereinafter COLC] as an executive agency of the Federal Government, and Section 3(a) delegated to COLC all powers vested in the President by the Economic Stabilization Act of 1970 except those specifically reserved.

(9) COLC in turn, on August 20, 1971, delegated to the Director, Office of Emergency Preparedness [hereinafter OEP] the responsibility and authority to implement, administer, monitor, and "enforce the stabilization of prices, rents, wages and salaries as directed by Section 1 of the [Executive Order No. 11615]." Cost of Living Council Order No. 1, 36 F.R. 16215.

(10) On August 21, 1971 OEP issued Economic Stabilization Regulation No. 1, 36 F.R. 16515. Section 3(c) of that regulation provides:

> "*Wages and Salaries.* Deferred wage or salary increases which were negotiated to take effect in the future, cost of living increases built into wage contracts or provided by management, and routine in-grade increases not in effect on or before August 14, 1971, are not permitted. Regardless of any right or contract heretofore or hereinafter existing, no change or adjustment shall be made in rates of wages, salaries, or other forms of compensation whether by retroactive increase or otherwise."

(11) Thereafter the plaintiffs directed an inquiry to the Postmaster General as to the impact of Regulation No. 1 on their wage agreement. Assistant Postmaster General Gayle informed the plaintiffs that by reason of the promulgation of Executive Order No. 11615 as implemented by Section 3(c) of Eco-

nomic Stabilization Regulation 1, the Postal Service for the duration of the freeze would not honor its contractual commitments to grant in-grade increases after specified periods of satisfactory service nor would it pay the several $250 wage increases.

(12) As a result of the position taken by the Postmaster General and the Postal Service, postal employees represented by the plaintiffs have been and will be denied in-grade wage increases for satisfactory service to which they are contractually entitled under the "compression agreement" of November 18, 1970. In addition, the approximately 650,000 postal employees who, under the July 20, 1971, working agreement, will become entitled to a $250 per annum increase will not receive that increase.

## III

The plaintiffs, relying on the last sentence of paragraph 10(c) to the effect that,

"the Postmaster General shall establish wages, hours, and working conditions in accordance with the terms of any agreement or agreements made under this section notwithstanding the provision of any law other than title 39"

and the language of Section 208 of Title 39 enacted by Section 2 of the PRA to the effect that no alteration, amendment, or repeal by Congress of any section of Title 39

"shall impair the obligation of any contract made by the Postal Service under any power conferred by this title,"

take the position that Congress has conferred upon the union members a blanket exemption from any congressional act that might be in derogation of the obligations set forth in the wage agreements reached with the postal authorities. Accordingly they assert the general provisions of the Economic Stabilization Act of 1970 have no application to them.

At the outset it is clear that Section 208 of Title 39 relied on by the plaintiffs is not applicable to this case. That Section purports to preclude impairment of contracts made under the authority of Title 39 through alteration, amendment, or repeal of Title 39. But the contracts in question were negotiated pursuant to Section 10(a) of the PRA (not a part of Title 39) and, if they are threatened by a temporary freeze, they are threatened by the operation of the Economic Stabilization Act of 1970 and not by amendment or repeal of Title 39.

Moreover, the Court cannot find that Section 10(c) of the PRA was intended to grant immunity from the effects of general economic legislation to contracts negotiated under Section 10. The meaning of Section 10(c) becomes apparent from an examination of the context in which it was enacted. As noted above, Section 10 was a transitional provision of the PRA and was not made a part of the permanent laws codified in Title 39. It was effective immediately upon enactment of the Postal Reorganization Act on August 12, 1970, to permit the immediate commencement of collective bargaining, without waiting for the Postal Service to become fully operative. Permanent provisions of the PRA (e. g. 39 U.S.C. § 410) designed to remove postal employees from the ambit of the Civil Service laws did not become effective until July 1, 1971, the date established by the Board of Governors pursuant to Section 15 of the PRA. For that reason, it was necessary for Congress to provide a coextensive provision in the transitional collective bargaining section which would achieve the same result. The Court accordingly believes that the "notwithstanding" language of Section 10(c) was intended by Congress to accomplish the limited purpose of removing postal employees, during the

**570**

transitional period, from the application of the Civil Service laws.

■■ Furthermore, it is the opinion of the Court that the Economic Stabilization Act granted the President the authority to promulgate orders applicable to *all* wages. The plaintiffs point out that the Act does not expressly state that it applies to the government and contend that the rule of construction enunciated in United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), requires the Court to construe the statute as not applicable to the government. That rule states that "statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect." 330 U.S. at 272, 67 S.Ct. at 686. However, this general rule is of limited applicability. Where the accomplishment of the clearly manifested legislative purpose of the statute would be frustrated unless the statute was applied to the government, the courts will not resort to a rule whose purpose is but to resolve doubts where the statute's aims are unclear. Sutherland, Statutory Construction § 6302 (3rd Ed. 1943). Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937); United States v. Arizona, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935); United States v. California, 297 U.S. 175, 56 S. Ct. 421, 80 L.Ed. 567 (1936). It appears that this exception to the general rule would apply in the instant case. The objective of the Economic Stabilization Act of 1970 is clear, i. e., to give the President wide discretionary powers to stabilize prices, rents, wages and salaries in order to combat the problems of inflation, unemployment and growing trade deficits which afflict our nation. It is also clear that achievement of these objectives would be severely undermined if the enabling statute was construed to allow the stabilization of wages in the private sector only.