**LOCAL 1115, NURSING HOME, HOSPITAL, SENIOR CITIZENS HOTEL UNION, an unincorporated independent association, Plaintiff,**

v.

**HIALEAH CONVALESCENT HOME, INC., a Florida corporation, et al., Defendants.**

**No. 71–1963–Civ–JLK.**

United States District Court,
S. D. Florida.

Sept. 26, 1972.

Mamber, Gopman, Epstein, Miles & Foosaner, by Allan M. Elster, Thomas J. Pilacek, North Miami Beach, Fla., for plaintiff.

Cohen & Hogan, P. A., by Ben Cohen, Miami Beach, Fla., for defendants.

## OPINION AND ORDER AFFIRMING ARBITRATION AWARD

JAMES LAWRENCE KING, District Judge.

This action to enforce an arbitration award presents the related questions of whether an employer's unilateral refusal to grant negotiated wage increases in reliance on the wage-price freeze is an arbitrable issue and, if so, whether consideration of Pay Board regulations by the arbitrator to determine their applicability is so far beyond the proper scope of arbitration as to preclude enforcement of the award.

The undisputed facts reveal that on November 28, 1969, plaintiff Local 1115, Nursing Home, Hospital, Senior Citizens and Hotel Union, an unincorporated association, entered into valid collective bargaining agreements with defendants Hialeah Convalescent Home, Inc., Oliver

Manor Nursing Center, Inc., and Ramsey Nursing Home, Inc.—all Florida corporations. The contracts provided annual wage increases for a minimum rate of $65.00 per week effective November 1, 1969, $72.50 per week effective November 1, 1970, and $85.00 per week effective November 1, 1971.

Defendants withheld the last scheduled increment on the ground that it was prohibited by the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (1970), *as amended*, (Supp. I, 1971). The Act was implemented by Executive Order 11615, 3 C.F.R. 199 (Supp.1971), on August 1, 1971, for a 90-day period commonly known as Phase I; and by Executive Order 11627, 3 C.F.R. 218 (Supp.1971), issued on October 15, 1971, for Phase II which began on November 14, 1971.

Executive Order 11627 continued the Cost of Living Council, which had issued all regulations for the Phase I wage-price freeze, and established the Pay Board to assist the Council in the stabilization of wages and salaries during Phase II. The Council immediately delegated to the Pay Board authority to "establish criteria, standards, and implementation procedures designed to stabilize wages and salaries within the general economic stabilization goals and coverage determination developed by the Council." COLC Order No. 3, 36 Fed. Reg. 20202 (Oct. 15, 1971). Together, the two agencies issued initial Phase II wage control guidelines on November 13, 1971. Pay Board regulations in effect since that time have provided procedures for implementing wage increases under pre-existing contracts and for securing retroactivity where previously negotiated wage increments had fallen due during Phase I.

When defendants failed to implement the wage increase after the inception of Phase II, plaintiff moved to obtain it through arbitration as provided by the grievance procedure of the contracts. After due notice, the parties appeared before the arbitrator, Judge Jason M. Berkman, and had an opportunity to submit evidence and conduct argument. On December 7, 1971, the arbitrator submitted an award in which he ruled that defendants were obligated under the contracts to pay the negotiated increase from November 1, 1971.

Judge Berkman went on to observe that the wage-price freeze was inapplicable by its terms as a bar to payment of the scheduled increases. He noted that Phase II guidelines did not apply to preclude the wage increment; rather, under Pay Board regulations, defendants had become obligated during Phase II to pay the increase pending an adverse determination of the Pay Board, and the burden of securing such a ruling, if desired, fell on defendants.

The arbitrator also pointed out that no bar remained during Phase II to payment of that portion of the contractual increase due for work completed during Phase I, given his finding that the employees affected had been earning less than $2.00 per hour: the Pay Board had authorized such retroactive payments in cases of "severe inequity," which it defined to include those who earned less than $2.00 per hour at the start of Phase I.

Upon defendants' failure to comply with the order of the arbitrator, this action was brought to enforce the award and is now before us on cross motions for summary judgment. The Court has jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1970).

### ARBITRABILITY

Defendants contend that the matters on which the arbitrator ruled were not arbitrable under their contracts. Plaintiff responds with the threshold argument that this question may not properly be raised in an action to enforce an arbitration award, even conceding that defendant contested arbitrability from the start.

### A.

Whether the issue of arbitrability may be considered in an action to en-

force an arbitration award, as opposed to a suit to enforce an agreement to arbitrate, has apparently never been directly decided. There is authority in this circuit for the proposition that absent a challenge to the jurisdiction of the arbitrator or the regularity of the proceedings, a claimant may not collaterally attack the arbitrability of the dispute. Woolley v. Eastern Air Lines, Inc., 250 F.2d 86, 91 (5th Cir. 1957); Sigfred v. Pan American World Airways, 230 F.2d 13, 17 (5th Cir. 1956). Moreover, plaintiff notes that the Ninth Circuit has gone so far as to imply waiver of the arbitrability issue from the mere act of submitting to arbitration, declaring that "a *claimant* may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrators to act." Ficek v. Southern Pacific Co., 338 F.2d 655, 657 (9th Cir. 1964) (emphasis added).

However appealing this view may be, these cases challenging Railway Labor Act adjustment board arbitrations are not apposite. They interpret Congressional intent in that Act to require a voluntary election by claimants between the courts and the adjustment tribunals it authorizes. Even if we were to accept, arguendo, the doubtful proposition that Congressional intent was identical in the Labor Management Relations Act, we would be compelled to point out that defendants here are not "claimants." Rather, they were called into arbitration, protesting all the while that they had never agreed to arbitrate the issues and acceding to the process only on the understanding that to do so would not prejudice their right to a court hearing on arbitrability. Nor can it be said that defendants sought two bites at the apple under the arbitration agreements here. Had they chosen to delay resolution of the dispute by refusing to arbitrate without a court order holding the issue arbitrable, their demand would have been honored.

On the other hand, defendants' contention that waiver is never to be implied in labor proceedings, but that there must be a voluntary waiver of a known right, is equally wide of the mark. That rule emerged from actions to enforce National Labor Relations Board refusal-to-bargain orders and was based on alleged union waiver of contractual rights. Sinclair Refining Co. v. NLRB, 306 F.2d 569, 575 (5th Cir. 1962); NLRB v. Gulf Atlantic Warehouse Co., 291 F.2d 475, 477 (5th Cir. 1961); Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). If defendants waived any right, it was not a contractual, but a statutory one. The right they sought to protect, a judicial determination of arbitrability, was created not by the labor agreements but by an act of Congress with a cognizable legislative intent to allocate jurisdiction between the labor board and the courts so as best to effectuate differing labor policies. *See* Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 452, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957). Because of these policy differences, we are not prepared to say that there might be no circumstances in which an employer's or union's waiver of arbitrability could not be implied from the fact that the parties proceeded to arbitration.

The principle which must guide resolution of the question before us emanates from Section 203(d) of the Labor Management Relations Act, 29 U.S.C. § 173(d) (1970): "Final adjustment by a method agreed upon by the parties is [hereby] declared to be the desirable method for settlement of grievance disputes . . . ." In interpreting this provision, the Supreme Court has emphasized that arbitration of employer-employee disputes is not a substitute for litigation; rather, it is a substitute for industrial strife. United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). We therefore find it difficult to conclude that either party to a labor dispute should be penalized for proceeding directly to arbitration in a good faith effort to prevent delay. Such a

ruling would mean that no employer wishing to contest arbitrability could afford to go to arbitration without a court order compelling him to do so, regardless of the consequences for the prevention of industrial strife. Thus, to hold that defendants waived their right to challenge arbitrability, despite their good faith and their express efforts to reserve the issue for judicial consideration, could only undermine the "congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration." *Id.* at 582, 80 S.Ct. at 1353.

■ The only factor which might militate against consideration of arbitrability in a proceeding to enforce an arbitration award is the danger of its confusion with the issue of whether the arbitrator exceeded the scope of his authority. However similar, the two inquiries must be carefully distinguished, for the proper purview of each is different. Although in a suit to compel arbitration a limited examination of the merits may be unavoidable to determine whether the dispute falls within a category upon which there was agreement to arbitrate, the Supreme Court has emphasized in the Steelworkers trilogy that the inquiry into arbitrability must be strictly confined to consideration of the parties' intent as it is expressed in their contract. 363 U.S. at 582–83, 80 S.Ct. 1347; United Steelworkers v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). In an action to enforce an arbitration award, on the other hand, courts are entirely forbidden to consider the merits in ruling on whether the arbitrator exceeded the scope of authority articulated in the submission to arbitration: they may not substitute their judgment for his merely because they disagree with his construction of the contract. United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

■ Although the fact that these two issues ordinarily arise at different stages of the proceedings helps prevent their confusion, we do not think that danger so great, on balance, as to preclude the resolution of both matters in the same action. Consequently we hold that because defendants proceeded in good faith and without delay to arbitration, while expressly reserving the issue, they did not waive their right to a judicial determination of arbitrability.

### B.

■ Defendants base their challenge to the arbitrability of this dispute on the argument that because the parties could not have foreseen the imposition of wage and price controls when they negotiated their contracts, they could not have intended that disputes concerning application of the controls be subject to resolution by arbitration. We disagree.

Assuming, without deciding, that the issue to be taken to arbitration is properly characterized by defendants as a dispute over the application of the wage-price controls, we must note that careful scrutiny of their contracts reveals no objective indication that the parties intended otherwise than to submit all their disputes, of whatever origin or character, to arbitration. Each agreement provides:

"All complaints, disputes or grievances whatsoever, of whatever kind or nature, arising between the Union and the Employer concerning any provision of the contract, or with respect to any other act, conduct or relation between the parties, directly or indirectly, shall be submitted to arbitration."

No exceptions to arbitrability are indicated by the management rights clause of the contracts; rather, the agreements expressly subject both disputes arising from discharges and those from the sale or assignment of the business to arbitration. Nor do the contracts contain any language expressly forbidding the arbitrator from determining arbitrability.

■ Since *Warrior & Gulf*, it has been the rule that "[a]*part from mat-*

*ters that the parties specifically exclude,* all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement." 363 U.S. at 581, 80 S.Ct. at 1352 (emphasis added). Yet defendants' contracts contain no express exceptions to arbitrability. Moreover, the arbitration clause is far more encompassing than those upon which courts have denied arbitrability. *See, e. g.,* Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241–244, 82 S.Ct. 1318, 1321, 8 L.Ed.2d 462 (1962). In fact, the clause is so broad that we can only conclude that it covers the instant controversy, however characterized, as a "dispute . . . with respect to any . . . relation between the parties."

Nonetheless, we cannot ignore the thrust of defendants' contention that the contracts are not arbitrable. They assert that to permit labor arbitrators to order payment of privately negotiated wage increases would undermine uniform administration of the nation's wage-price program and thereby defeat the implementation of public policy. This position has received the approval of a New York court of first impression in Board of Education v. West Islip Teachers Assn., 68 Misc.2d 830, 328 N. Y.S.2d 266 (Sup.Ct.1972), although the decision there was dictated, in the view of the court, by the doctrine of federal pre-emption. A similar concern over private resolution of public issues appears to be at work in decisions holding that the illegality of a contract clause under the antitrust laws can be asserted as a defense to the duty to arbitrate a dispute over its interpretation. *See* Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753, 422 F.2d 546 (7th Cir. 1970); Silvercup Bakers, Inc. v. Fink Baking Corp., 273 F.Supp. 159 (S. D.N.Y.1967).

■ We wholeheartedly concur with the general proposition that enforcement of arbitration awards which vitiate public policy determinations should not be countenanced by the courts. But we cannot agree that public policy would inevitably be frustrated by a ruling that this or similar wage-price control disputes are arbitrable.

In a suit to enforce an agreement to arbitrate, courts will ordinarily have no means of knowing, as we do here, how the arbitrator will rule. They will therefore find themselves in a singularly ill-suited position to determine whether the policies of the wage-price program would be frustrated by his award, absent a forbidden exhaustive inquiry into the merits of the dispute. It may well be that the arbitrator's award will not conflict with national wage-price policy, and that the proceeding will have, as the Supreme Court observed in *American Manufacturing,* "therapeutic values of which those who are not a part of the plant environment may be quite unaware." 363 U.S. at 568, 80 S.Ct. at 1346.

■ Consequently, we are of the opinion that where wage-price disputes are within the ambit of the arbitration clause, they should not be held inarbitrable unless it is apparent beyond a doubt that under no circumstances could an award issue granting increased benefits which would not frustrate the wage-price control program. Such an exception might have been presented, for example, by a suit brought during Phase I to compel arbitration of a dispute over nonpayment of wage increases due during that period: no wage boosts of any sort being permitted under Phase I, an award granting the requested relief could not be enforced without frustrating public policy. A similar situation was apparently presented by the West Islip teachers case. There the Board of Education sought to stay arbitration of the teachers' demand for retroactive payment during Phase II of salaries due in Phase I. But under Pay Board regulation § 201.13 issued on November 13, 1971, all such retroactive payments required prior Pay Board approval. 36 Fed.Reg. 21970. Thus, an award favorable to the teachers could not have been enforced without defeating implementa-

tion of the wage-price control program unless, as we will hereinafter discuss, they earned less than $2.00 per hour or approximately $4,000 per year, a figure about half that of normal starting teachers' salaries.

■ Unlike the arbitration of antitrust issues, arbitration of wage-price disputes will not of itself inherently frustrate national policy. Pay Board regulation § 201.1, "Purpose and Scope," as amended on April 18, 1972, provides in pertinent part that "[t]hese regulations shall be construed in a manner consistent with the policies of the Act, and *every person subject to the provisions of these regulations shall be required to interpret and apply such provisions in good faith to carry out such policies*." 37 Fed.Reg. 7615 (emphasis added). This policy statement reflects the fact repeatedly emphasized by President Nixon that as a temporary measure, the wage-price control program was designed to be as simple and self-executing as possible to avoid the need for a sizeable bureaucracy to administer it. As a result, it relies for its success in great part on good faith private compliance and resolution of conflicts, subject to selective administrative checks, rather than exhaustive, centralized approval and control. Thus, it cannot be said that arbitrators are ill-equipped to determine the applicability of wage-price guidelines: they are as well equipped to do so as any other person subject to the Act's provisions. Expertise of the degree necessary for interpretation of the antitrust laws is neither demanded by the wage-price scheme nor required. Moreover, because effectuation of wage-price policy is entrusted more to voluntary individual compliance than to court enforcement, arbitration of wage-price disputes may be a tool to encourage good faith adherence to national goals, rather than an impediment to judicial vindication of public policy through private litigation, as has been held to be true of arbitration of antitrust questions.

For these reasons we are not persuaded that there is a sound basis for rejecting the Supreme Court's command in *Warrior and Gulf* that orders to arbitrate "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." 363 U.S. 582–583, 80 S.Ct. at 1553. Lacking any grounds for positive assurance that the arbitration clause does not, by its terms, cover this dispute, we hold that the dispute is an arbitrable one, however it may be characterized.

■ Nonetheless, it is our view that arbitrability can be upheld in this case on the basis of a narrower characterization of the issue. There can be no doubt that the question of whether or not under the terms of the contracts a wage increase came due and owing to union members on November 1, 1971, was properly placed before the arbitrator. This issue is clearly a "dispute" within the meaning and contemplation of the arbitration clause. Although a court might hesitate to compel arbitration of such a seemingly straightforward question, that is what the parties bargained for. Indeed, another case might raise complex questions of contract interpretation in which an arbitrator's expertise on the "law of the shop" would be invaluable. Yet despite the apparent simplicity of the issue here, the parties went to arbitration of their own accord, and we are not now disposed to relieve them of an obligation for which they bargained by second guessing their reasons for so proceeding.

Moreover, defendants themselves evidently were the ones who insisted that the arbitrator indicate how the wage increases could be paid in light of the wage-price freeze. This, strictly speaking, the arbitrator had no obligation to do under the contracts. Nor is it alleged that a special submission outside the negotiated arbitration clause imposed such an obligation on him. Thus, if anyone, defendants were responsible for removing the dispute from the ambit of those the parties intended to make arbitrable when they negotiated the agree-

ments. They cannot now be heard to complain, therefore, that they never intended to make such a dispute arbitrable. Consequently, we hold in the alternative that the dispute, properly characterized, was arbitrable.

## SCOPE OF AUTHORITY

Defendants contend, secondly, that the arbitrator so far exceeded the scope of his authority by interpreting wage-price regulations issued by the Pay Board in the course of his award as to render it unenforceable. For the reasons which follow, we cannot agree.

The arbitrator's award in this case is not entirely free from ambiguity. In a decision covering all three defendants he states that "it is the arbitrator's opinion that the Nursing Home is obligated to pay the minimum wage . . . as set forth in the contract between the parties." After finding that the employees earned less than $2.00 per hour, the arbitrator goes on to note that "it would appear that the Pay Board adopted a definition of severe inequity that would permit employees . . . to receive retroactive wage increases," and that "it would appear to this arbitrator that the burden of filing with the Pay Board would be the obligation of the Nursing Home and that until such time as the Pay Board enters a ruling contrary to the [agreements'] provisions . . . the Nursing Home is obligated to meet the minimum wage scale as set forth in the contract between the parties."

What is unclear from the opinion is the arbitrator's perception of the basis of his award. At first appearance, interpretation of Pay Board rules may seem central to the award. Yet further study discloses that the two direct references to Pay Board regulations are couched in advisory language, "it would appear that," rather than conclusory statement. In fact, the only definitive conclusion reached by the arbitrator is preceded by the straightforward clause, "it is the arbitrator's opinion that." Because he was under no obligation to render advice on Pay Board rules, as we have noted, we cannot state with any degree of certainty that the arbitrator did otherwise than properly base his award on the narrow issue of whether a wage increase was due and owing under the contracts. His references to Pay Board regulations are ambiguous: they are at least as consistent with the conclusion that they are simply advisory as with the view that they are part and parcel of the award.

■ Although the ambiguity may cast doubt on whether the arbitrator exceeded the scope of his authority, that fact alone provides no cause for refusing enforcement. As the Supreme Court has noted in *Enterprise,* to require unambiguous opinions might lead arbitrators to play it safe by writing none, thereby defeating the coordinate goals of engendering confidence in arbitration and clarifying the contract at issue. Thus, "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award." 363 U.S. at 598, 80 S.Ct. at 1361.

■ But even assuming that the award clearly demonstrated that the arbitrator ruled on Pay Board regulations, we cannot say with certainty that he exceeded the scope of his authority. The arbitrator carefully limited his consideration of the regulations to a determination of their applicability to the wage increases at issue. His comments went no further than to note that the regulations were inapplicable as a bar to his award. We are not convinced that this limited consideration of Pay Board regulations represents such an arbitrary and capricious determination as to render the award unenforceable.

Five cases are cited by defendants in support of their contention that even the arbitrator's limited perusal of Pay Board regulations went beyond the proper scope of his authority, but they fall wide of the mark. In *Cunningham v. Board of Education,* 20 Wage & Hour

Cas. 574 (N.Y.Sup.Ct. Nov. 12, 1971), a New York court of first impression held that teachers' wage increases that did not take effect until after the commencement of Phase I were barred by Cost of Living Council regulations, and therefore that their contract could not be enforced by the court. Similarly, in Haskins v. Cost of Living Council, 20 Wage & Hour Cas. 298 (D.Kan. Oct. 23, 1971), the District Court ruled that wage increases for Kansas teachers took effect under their contracts after August 15, 1971, and consequently could not be judicially enforced during Phase I.

Defendants argue from these two decisions that an arbitrator necessarily lacks authority to order adherence to contract provisions which courts will not enforce. But the cases are inapposite: plaintiff does not challenge defendants' refusal to pay the increases during Phase I, nor did the arbitrator suggest that payments should have been made during that period. On the contrary, plaintiff submits that under Phase II regulations no bar remained after November 14, 1971, to retroactive payment of wage increases due for work completed during Phase I.

Similarly, both Zuckman v. United States, 20 Wage & Hour Cas. 172 (D.D.C. Sept. 2, 1971), and National Assn. of Letter Carriers v. United States Postal Service, 333 F.Supp. 566 (D.D.C.1971), were products of the Phase I rules. The former involved a challenge to the constitutionality of the wage-price freeze; the latter, a conflict between the Postal Reorganization Act and the Economic Stabilization Act. Although the *Zuckman* court declined to enjoin application of Phase I regulations pending a constitutional challenge, in part because to do so would be contrary to the overriding public interest of halting inflation, the public interest has been substantially re-defined by the Phase II regulations at issue here. In *Letter Carriers*, the court ruled only that the Postal Reorganization Act did not, by its terms, reflect Congressional intent to exempt

postal employees from any future form of economic regulation, and that Phase I barred negotiated postal wage increases. Here the question of the applicability of the wage-price freeze arises not from the wording of a conflicting federal statute, but from the Phase II regulations issued under the Economic Stabilization Act.

The only case cited by defendants that deals with Phase II regulations is United States v. Great A. & P. Tea Co., 342 F.Supp. 272 (D.Md.1972). There the issue, as framed by the court, was whether a wage increase in excess of 5.5 percent that was negotiated and paid after November 14, 1971, violated Phase II regulations for lack of prior Pay Board approval. But in holding that prior approval was required, the court relied on Pay Board regulation § 201.11 which specifically required such approval for contracts negotiated after November 14. 36 Fed.Reg. 25428 (Dec. 31, 1971). The case must be carefully distinguished from the requirements for contracts negotiated before November 14, such as that in the case at bar, which are controlled by a different regulation which we will examine later.

 Although defendants can cite no controlling precedent demonstrating that the arbitrator exceeded the scope of his authority, we would be loath to grant enforcement to an arbitration award which undermined administration of the wage and price control system. Yet we are not persuaded that the award before us has that effect in view of the arbitrator's limited determination of the applicability of the Phase II regulations. Moreover, such a limited determination is nowhere prohibited by the Phase II regulations; on the contrary, it is encouraged by Pay Board regulation § 201.1, as we have noted.

 Nonetheless, we must acknowledge the requirement of *Enterprise* that "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." 363 U.S. at 597, 80

S.Ct. at 1361. The Supreme Court has elaborated:

"He may of course *look for guidance* from many sources, yet his award is legitimate only so long as it draws its *essence* from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Id.* (emphasis added).

Although we are convinced, and so hold, that the instant award "draws its essence" from the contracts and does no more than "look for guidance" to the Phase II regulations, we hold alternatively that to the extent the arbitrator may have gone beyond the "essence" of the agreements, he exceeded the scope of his authority.

Assuming, therefore, that the arbitrator's consideration of the applicability of the Phase II regulations exceeded the scope of his authority and that the award may be enforced only to the extent that it declares that the wage increases were due and owing under the contracts on November 1, 1971, we must determine whether enforcement of this portion of the award would be a nullity, since equity will not do a vain thing.

## PAY BOARD REGULATIONS

■ We cannot therefore avoid the question of whether or not the Pay Board regulations governing Phase II of the wage-price freeze prohibit payment by defendants of the wage increases found by the arbitrator to be due and owing on November 1, 1971. For the purpose of analysis, it will be helpful to distinguish between the defendants' obligation to pay the increases for work performed after the termination of Phase I and their obligation to make retroactive payments during Phase II for work performed during Phase I.

That defendants were free at the inception of Phase II to pay the wage increases negotiated under their preexisting contracts cannot be doubted after an examination of Pay Board regulations and interpretive rulings. Pay Board regulation § 201.14 issued on November 13, 1971, provided in pertinent part:

"Existing contracts and pay practices previously set forth will be allowed to operate according to their terms except that specific contracts or pay practices are subject to review, when challenged by a party at interest or by five or more members of the Pay Board, to determine whether any increase is unreasonably inconsistent with the criteria established by this Board . . . ." 36 Fed.Reg. 21791.

In an interpretive decision adopted November 12, 1971, the Pay Board elaborated on the effect to be given this regulation as follows:

"This means that, effective November 14, 1971, all the terms of such contracts and pay practices are fully operative. In the event of a challenge, these terms shall remain in effect unless and until the Pay Board rules otherwise.

"The prenotification reporting requirements with respect to such contracts and pay practices are waived for all pay increases thereunder prior to January 1, 1972. However, reports will have to be filed by January 1, 1972, on forms to be developed as to any pay increases in the above categories which are placed in effect prior to January 1, 1972. Such reports are required only in bargaining or pay practice situations involving 1,000 or more employees." 36 Fed.Reg. 21952 (Nov. 17, 1971)

On April 19, 1972, Pay Board regulation § 201.14 was amended to accord with the interpretation it had been given from the start of Phase II:

"(a) *In general.* Employment contracts and pay practices previously set forth which existed prior to November 14, 1971, will be allowed to operate according to their terms. However, any such specific contract or pay practice, when challenged by a party at interest or by two or more members of the

Pay Board, is subject to a review to determine whether any wage and salary increase granted pursuant to such contract or pay practice is unreasonably inconsistent with the criteria established by the Board. In the event of a challenge, these terms shall be allowed to remain in effect unless and until the Pay Board rules otherwise." 37 Fed.Reg. 7697.

■ Section 201.14 remains substantially the same to date. Unlike Pay Board regulation § 201.11, which applies to contracts negotiated after November 14, 1971, and requires prior approval by the Pay Board of increases in excess of 5.5 percent, section 201.14 applies to "existing contracts" or, as it has subsequently been refined, "contracts . . . which existed prior to November 14, 1971." As the provision that the terms of challenged contracts are to remain in effect pending an adverse determination by the Pay Board manifests, no prior approval is now, nor ever has been required for the implementation of increases permitted by section 201.14. *Accord,* Davis v. Servis Equip. Co., 80 L.R.R.M. 2020 (N.D.Tex. Mar. 31, 1972).

If evidence should be sought that section 201.14 applies to the contracts of the parties now before the court, it is to be found in Pay Board ruling 1972–9, issued February 18, 1972. There the Pay Board ruled that increases due on November 30, 1971, under a contract entered into on November 30, 1970, could be paid pending an adverse determination by the Pay Board. 37 Fed.Reg. 3995 (Feb. 25, 1972). Likewise, Pay Board ruling 1972–1 issued February 4, 1972, held that even increases exceeding the Phase II 5.5 percent general wage and salary standard which were due after November 14, 1971, under a contract in existence prior to that date could be paid. 37 Fed.Reg. 2987 (Feb. 10, 1972).

Governed by section 201.14, the contracts between the parties could "operate according to [their] terms" during Phase II. Although the plain meaning of that phrase is clear if it, too, is taken

at face value, uncertainty and confusion have surrounded its application, particularly where, as here, increases due before November 14, 1971, were barred by Phase I. Whatever doubt may have existed, it should have been dispelled by Pay Board ruling 1972–5 issued on February 4, 1972. After noting that cost-of-living benefits are treated the same as wages and salaries under the Phase II regulations, the Pay Board ruled that cost-of-living increases due during Phase I could be paid effective November 14, 1971, just as all wages and salaries negotiated in contracts existing before that date. 37 Fed.Reg. 2988 (Feb. 10, 1972). Consequently, we hold that the wages due for work performed after November 14, 1971, were not barred by Phase II of the wage-price freeze and could have been paid without prior Pay Board approval.

Similarly, Pay Board regulations make it clear that defendants were free to make retroactive payments during Phase II for work performed during Phase I by those of their employees earning less than $2.00 per hour. Pay Board regulation § 201.13, "Scheduled increases in wages and salaries for services rendered after August 15, 1971, and before November 14, 1971," as first issued on November 13, 1971, required prior Pay Board approval of all retroactive increases. Yet the possibility of an exception was left open by subsection 201.13(c) for cases where "it is demonstrated that the proposed retroactive payment satisfies such further criteria as the Pay Board may hereafter establish to remedy severe inequities." 36 Fed.Reg. 21791.

In an interpretive decision adopted November 19, 1971, the Pay Board ruled as follows:

"For purposes of permitting retroactivity in cases of severe inequities under § 201.13(c) during the freeze period, payments of retroactive increases may be made to employees who would have become eligible for a pay increase during the freeze and

whose rate of pay prior to the freeze was $2.00 per hour or less." 36 Fed. Reg. 22581 (Nov. 25, 1971).

On November 22, 1971, the Pay Board adopted a procedural decision permitting employers to institute retroactive payments without prior Pay Board approval. It stated that "[s]ubject to spot-checks for compliance by the Internal Revenue Service, employers may determine for themselves whether to make retroactive payments applicable to the freeze period . . . ." 36 Fed.Reg. 22582 (Nov. 25, 1971).

These interpretive and procedural decisions were replaced on December 7, 1971, the date of the arbitrator's decision herein, by Pay Board regulation § 201.16, "Retroactivity, self-determinations; criteria for severe inequities," which provided, effective November 14, 1971:

> "Employers may make retroactive payments on their own determination, subject only to compliance checking by the Secretary of the Treasury (or his delegate) in verification thereof, that they qualify to make retroactive payments to remove severe inequities in the following circumstances—

> "(a) An employee member of an appropriate employee unit earned $2 or less per hour straight time prior to the freeze and would have become eligible without changing the nature or classification of his services for a pay increase in the straight time hourly rate but for the operation of the freeze." 36 Fed.Reg. 23219.

Thus, there can be no doubt that defendants were free to disburse, without prior Pay Board approval, the retroactive payments they were obligated by their contracts to make, and we so hold.

Despite defendants' apparent good faith in proceeding without delay to arbitration, we must note that their subsequent conduct has not always reflected a similar commitment. Not only did they decline to make retroactive payments, about which good faith confusion might have existed, but they have refused to this day to begin the increases due under their contracts and payable without restriction during Phase II—this in the face of the arbitrator's award and the plain language of Pay Board regulations and interpretive rulings. Moreover, although defendants based their objections to these disbursements on the mistaken view that prior Pay Board assent was required, they nonetheless made no effort to secure that approval. As a result of defendants' inaction, plaintiffs were left with no pay increase to challenge to secure a Pay Board ruling, nor any means except arbitration to force defendants to pay the increases: each contract provided that "[t]he procedure for arbitration is the sole and exclusive remedy of the parties, and such procedure shall be in lieu of any and all other remedies, forums at law, in equity or otherwise." Defendants' actions therefore fall short, in our opinion, of the requirement in Pay Board regulation § 201.1 that employers "interpret and apply [wage freeze] provisions *in good faith.*" 37 Fed.Reg. 7615 (April 18, 1972) (emphasis added).

Consequently, these employees have labored nearly a year as this litigation has dragged on, subject to exactly the "severe inequities" which the Pay Board sought to nip in the bud. Were it not for the vigorous legal representation provided by their union, they might even now be laboring under the false impression that no better relief could be had for their plight from a day in court than from several days on strike. Therefore, it is,

Ordered and adjudged that defendants' motion for summary judgment be and the same is hereby denied; and that plaintiff's motion for summary judgment be and the same is hereby granted.

In decreeing specific performance, the Court further orders:

1. Starting with the first weekly payroll period beginning after the date of this order, defendants shall commence payment of wages at the increased rates due under their contracts on November

1, 1971, to all employees in the bargaining units.

2. Within ten (10) days of this order, defendants shall furnish to J. K. Lasser & Co., 1876 N.W. 7 Street, Miami, Florida, for the purposes of conducting an audit to determine back wages due, all items listed in paragraph 2 of the stipulation filed June 2, 1972, and such other items as he may reasonably require. The auditor shall conduct such investigations or hold such hearings as may be required to determine back wages due, and shall furnish copies of his findings both to plaintiff and defendants. Defendants shall bear the reasonable cost of the audit.

3. All back wages due both to present and former employees from November 1, 1971, which have not yet been disbursed shall be paid in full by defendants within a reasonable time of the completion of the audit, but in no event later than December 15, 1972. Payment shall be made either to plaintiff in trust for, or directly to the individual employees to whom the back wages are owed. In the latter event, copies of all records of disbursements and cancelled checks shall be furnished to the auditor and, upon request, to plaintiff.