GENERAL WAREHOUSEMEN AND HELPERS LOCAL 767, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Plaintiff-Appellant,

v.

STANDARD BRANDS, INC., Defendant-Appellee.

GENERAL WAREHOUSEMEN AND HELPERS LOCAL 767, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Plaintiff-Appellant Cross-Appellee,

v.

STANDARD BRANDS, INC., Defendant-Appellee Cross-Appellant.

Nos. 75–3797, 76–1579.

United States Court of Appeals, Fifth Circuit.

Sept. 15, 1978.

---

**1284**

James L. Hicks, Jr., Dallas, Tex., for plaintiff-appellant in both cases.

William L. Keller, Allen Butler, William F. Carroll, Dallas, Tex., for defendant-appellee in both cases.

Before BROWN, Chief Judge, TUTTLE, WISDOM, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, and VANCE, Circuit Judges.

COLEMAN, Circuit Judge.

This suit was brought under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), by a Teamsters local, the appellant here, to enforce an arbitration award. A preliminary injunction was denied by the District Court. The Teamsters appealed that denial, but before we could hear the appeal the District Court reached the merits and denied enforcement of the arbitration award. This, too, was appealed. Standard Brands, Inc., cross appealed, asserting additional grounds for refusing to enforce the award. The appeals were consolidated. A divided panel of this Court reversed the District Court and ordered enforcement of the award, *General Warehousemen and Helpers Local 767 v. Standard Brands, Inc.,* 5 Cir. 1977, 560 F.2d 700. Rehearing *en banc,* sought by *Standard Brands,* was granted.

The arbitration process was, itself, regular and had been pursued in accordance with the provisions of a collective bargaining agreement. The complication is that the *remedy* prescribed by the arbitrator required the employer to violate the terms of another of its collective bargaining agreements with a bargaining unit duly certified by the National Labor Relations Board.

We affirm the denial of enforcement for the arbitrator's award, but we remand the case for further proceedings not inconsistent herewith.

## I. THE FACTUAL BACKGROUND OF THE CASE

The basic facts are not in dispute. Standard Brands manufactures, among other things, margarine. Since at least 1943 it has operated a manufacturing plant in Dallas, Texas. Apparently, this plant was

quite old; it had been used by various companies for nearly fifty years. Standard had never owned it, however, but had operated it under a series of leases. It appears that there was no room for expansion of the three manufacturing lines: two quarter-pound (stick) margarine lines and one whipped (stick) margarine line.

At the outset of this litigation, some 48 Dallas employees of Standard were represented by the Teamsters local. Of this 48, three had over 30 years of service, five others had over 20, and eighteen others had more than 10 years. The Dallas agreement between the Teamsters and Standard, effective for the period May 1, 1973—April 30, 1976, contained provisions protecting the rights of the employees if the Dallas operations should be "transferred permanently to a new or existing plant . . . ." The provisions of that contract, which play a crucial role in the disposition of this case are printed in the margin.[1]

As had been its custom, Standard executed a three-year extension of its lease on the Dallas plant on October 30, 1970. Sometime thereafter, Standard began searching for a new plant site in the Dallas area. The search narrowed to Denison, Texas—some 75 miles away—and on October 14, 1973, Standard announced selection of a tract of land at Denison. Shortly before this announcement, Standard entered into a letter agreement with the owners of the Dallas property for a one-year lease, with an option to renew for two additional one-year periods. On October 25, 1974, Standard exercised the first of its two Dallas options. A week later, November 1, 1974, the Denison plant was formally opened.

The potentially adverse impact of the Denison plant was not lost on the Dallas employees or their union. As early as November 8, 1973, the Teamsters formally began efforts to obtain information from Standard and to arrange a solution to what they perceived to be a serious problem. A long series of letters and a few brief conversations between the Teamsters and

---

1. Part VIII, § 1:
 The Company recognizes the Union as the sole and exclusive collective bargaining agent for all production and maintenance employees and laboratory testers at the Company's margarine plant at Dallas, Texas, excluding supervisory, clerical and professional employees.
 Part I, § 13:
 (a) Before any plant or department is closed, the Union will, if possible, be given thirty days' prior notice.
 \* \* \* \* \* \*
 (e) Should the operation at any location be transferred permanently to a new or existing plant the available jobs at such plant will not be filled until employees of the affected plant have been given reasonable notice and the opportunity to fill them in accordance with their seniority and to transfer to the new plant. In the case of existing plant the foregoing provision shall be subject to the prior seniority rights, if any, of employees in such plant.

 (f) In case of transfer to a new plant, if permitted under the National Labor Management Relations Act, that Part of this Agreement relating to the plant affected shall cover such new plant.

 (g) The provisions of this Section 13 do not limit discussion between the Union and the Company on questions relating to the effect on Employees of plant or department closings or transfers. To implement such discussion the Company shall appoint one representative and the International one representative to the Committee hereby created to develop answers to the questions raised and, if they don't agree, they shall appoint a third and impartial member to join the Committee as Chairman to resolve such disagreement.
 Part I, § 14:
 \* \* \* \* \* \*
 (e) The Company will not interfere with the right of the Employees to become members of the Union and will not discriminate against any Employee because of such Union membership or Union activities.
 Part VIII, § 9:
 \* \* \* \* \* \*
 (f) . . . The arbitrator shall have no power to add to or subtract from or modify any of the terms of this Agreement, or any agreement made supplementary hereto.

Standard produced little more than Standard's disclaimer that it had any intention of closing the Dallas plant at that time. A more formal letter, propounding questions concerning the future of the Dallas plant, received a response from Standard that operations would not be transferred or eliminated, either immediately or in the near future.

Standard, however, did intend to open some lines to produce quarter-pound stick margarine at Denison. The original plans called for those lines, and machinery was ordered for two lines, with delivery scheduled for the summer of 1974. By the latter part of August, 1974, all of the machinery for one line had been received and stored in the Denison production area, and Standard had closed the bidding for the installation work. For reasons not revealed in the record, the Company suddenly made a decision to store this machinery in a warehouse and not to install it at that time.

The Teamsters, who seemingly had been content with the earlier answers to its specific questions, grew more anxious about the developing situation and, in August, fired off a series of letters to various Standard Brands officials. In one of these letters, dated August 27, the Teamsters demanded that the Dallas employees have job rights at the Denison plant. A brief response by Standard was followed by another letter from the Teamsters dated September 16. Apparently, Standard sent no further response. On the very day that the Denison plant opened, November 1, officials of Standard met with several Teamsters representatives in Dallas and reiterated their lack of knowledge of any plans to close the Dallas plant. On November 15, the Teamsters demanded transfer rights for 30 Dallas employees, but they received no response. Six days later, the Teamsters filed a grievance which asserted that the operation of the new plant would result in the closing of the old one and which sought

to protect the contractual rights of the Dallas employees in that event.

The arbitrator, Professor Charles J. Morris, did not hold his first hearing until February 28, 1975, after several other important events had taken place.

At Denison, a second union, the International Association of Machinists, began an organizing campaign as soon as the plant opened. On December 6, 1974, it filed an election petition with the NLRB. Teamster representatives were notified, the NLRB held a hearing at Fort Worth, and all the parties (Standard, the IAM, and the Teamsters) entered into a consent agreement that the Board should conduct an election at the Denison site. The Teamsters appealed, arguing that the Dallas employees should be entitled to vote in that election, but the NLRB on January 14, 1975, ruled that the election should be held. The IAM won the January 23 election by a vote of 19 4, and after a series of Teamster appeals the NLRB ordered on May 22, 1975, that the IAM be certified as the exclusive bargaining agent for the Denison employees. By June 8, Standard and the IAM signed a contract covering the employees in the certified unit. This contract was to expire June 11, 1978.

The arbitrator held two formal hearings in February and March, took extensive testimony, received numerous exhibits and comprehensive briefs, and personally visited the Dallas plant. The arbitrator received appropriate notice of the events detailed in the preceding paragraph, as well as a copy of Standard's September 2, 1975, announcement of its intention to close the Dallas plant effective one month later. Standard claimed that its decision to close the Dallas plant was due to managerial changes, a radical downturn in the sales of margarine, and economic unfeasibility of continued operation at the Dallas plant. On September 20, the arbitrator rendered his decision, sus-

taining the grievance. He found that in response to the union's requests the company had failed to provide the adequate and honest disclosures that the law required, that Standard had not provided the reasonable notice and opportunity to fill the Denison jobs to which the Dallas employees were contractually entitled, and that Standard had "discriminated against the Dallas employees because of their union membership and activities. . . ."

The arbitrator was convinced that these breaches of the collective bargaining agreement warranted a thoroughgoing remedy, in which he avowedly attempted to balance the rights of the Dallas employees against those of the Denison employees, who, of course, were not parties to the dispute. He refused to order the displacement of any Denison employees. Instead, he ordered that all Dallas employees who desired to transfer be permitted to do so and that Standard provide suitable employment for such transferees on stick or bulk margarine lines (equivalent to the Dallas operations and equipment). In addition, Dallas employees not otherwise assigned were to have first preference for new jobs for which they were qualified. *The transferees were to be given "superseniority", based upon the first day of Denison operations rather than the first day of their work in the new plant,* and they were to receive "compensation and other benefits" under the provisions of the then extant Dallas Teamsters contract.

Standard refused to comply with the literal terms of the award, but it did offer jobs to all its Dallas employees at either the Denison or Indianapolis plants, with wages and benefits to be paid according to the union contracts prevailing at those locations. For the Dallas employees, a transfer to Denison would have meant a significant drop in their wages and benefits, and apparently only one person was willing to accept those conditions.

On October 2, 1975, the Teamsters filed suit seeking enforcement of the arbitration award in its entirety, a preliminary injunc-

tion, and "all other and further relief, both at law and in equity, to which the plaintiff may show itself justly entitled". In addition, the Teamsters sought to reopen the certification proceedings on the basis of the arbitrator's findings and award, but the NLRB rejected this motion on November 13, 1975.

The case comes, then, to be evaluated on the following chronology:

| | |
|---|---|
| Nov. 1, 1974 | The Denison plant is opened. |
| Nov. 15, 1974 | Teamsters demand transfer rights for the Denison employees as per the Dallas contract. |
| Jan. 23, 1975 | IAM wins representation election at Denison. |
| May 23, 1975 | NLRB certifies IAM as the exclusive bargaining agent for the Denison employees. |
| June 8, 1975 | Standard and IAM sign contract. |
| Sept. 20, 1975 | Arbitrator renders decision. Dallas employees granted transfer rights to Denison. Their seniority rights to date from the day the plant opened. To receive compensation and benefits under the Dallas contract. |
| Oct. 1, 1975 | Standard Brands closes the Dallas plant. |
| Oct. 2, 1975 | Teamsters file suit to enforce the award. |

## II. THE PROCEEDINGS IN THE DISTRICT COURT

The District Court concluded that the arbitrator's award conflicted with the NLRB certification and therefore could not be enforced. Earlier, when the Court denied the plaintiff's motion for a preliminary injunction, it was the Court's understanding that the company had agreed to comply with all portions of the award except the provision applying the Dallas contract at Denison. At the subsequent hearing on the motion for a permanent injunction, however, it had

become clear that Standard was also resisting enforcement of the "superseniority" aspect of the award. Standard offered to let the Dallas employees transfer, but at the Denison wage rate. Since the Dallas personnel, with one exception, were unwilling to accept such conditions, the transfer issue remained unresolved. At the permanent injunction hearing the District Judge suggested that the seniority and transfer issues would become pressing only if the wages issue were reversed on appeal. The wages and seniority issues are properly before us and we are of the opinion that Standard should be held to its offer to allow the Dallas employees to transfer.

Because the order of the District Judge has such an important bearing on the issues with which we are confronted and the conclusions at which we have arrived, we quote from the District Judge's conclusions of law at the outset:

> The court is of the opinion that the arbiter exceeded the scope of his authority since his award is in conflict with the NLRB's certification of the IAM in Denison. Plaintiff argues that it does not contest the certification and that the arbiter's award was a proper contract remedy for violation of the collective bargaining agreement, but the plaintiff's view of the effect of certification is too narrow. The arbiter clearly recognized that his award would lead to employee frictions that the NLRB would oversee. It would have been proper for the arbiter to order the company to pay money damages or to require the defendant to hire the Dallas employees, but he took the further step of specifying wages and working conditions *after* the NLRB had certified the IAM as the exclusive bargaining agent for the Denison unit. That certification has now withstood an appeal to the NLRB. It is the court's opinion that the

arbiter's action in this regard conflicts with NLRB certification; therefore, the award cannot be enforced. Since the award is not enforceable the plaintiff is not entitled to damages, if any were sustained, for the defendant's failure to comply with the order.

The court is not unmoved by the employees' situation. As noted previously, the arbiter found a willful pattern of conduct on the company's part to deprive the Dallas employees of their rights and benefits pursuant to the Teamster's contract. The court is not at liberty to retry the matters before the arbiter and has accepted his findings. The court does not condone the company's conduct. There are nevertheless inherent problems with the award fashioned by the arbiter that makes it impossible to enforce without impinging upon the NLRB's jurisdiction.

## III. STANDARD'S CHALLENGES TO THE JURISDICTION OF THE DISTRICT COURT

### A. *Exclusive or primary jurisdiction of the NLRB*

Standard's first attack on the subject matter jurisdiction of the trial court comes by way of its assertion that the NLRB has exclusive and/or primary jurisdiction of the matters in issue. We believe Standard's reliance on such cases as *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), and *Garner v. Teamsters Local Union No. 776*, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), to be seriously misplaced. Those cases all involved the issue of whether state tribunals had been preempted by the NLRA,[2] not the issue presented in this case of whether federal courts have juris-

---

2. Recently, the Supreme Court held that state courts may entertain actions to enforce state trespass laws against picketing which is arguably, but not definitely, prohibited or protected

by federal law in *Sears, Roebuck and Co. v. San Diego County District Council of Carpenters*, U.S. , 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). The Court clarified the *Garmon-*

diction under § 301 of the NLRA to enforce arbitration awards. A long line of Supreme Court cases has reaffirmed the now-familiar doctrine that federal district courts have "jurisdiction . . . over enforcement suits even though the conduct involved was arguably or would amount to an unfair labor practice within the jurisdiction of the National Labor Relations Board." *Hines v. Anchor Motor Freight*, 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976).[3] Such suits are cognizable "because of the evident congressional determination that courts should be free to interpret and enforce collective-bargaining agreements even where that process may involve condemning or permitting conduct arguably subject to the protection or prohibition of the National Labor Relations Act." *Motor Coach Employees v. Lockridge, supra*, 403 U.S. at 300, 91 S.Ct. at 1925.

There is no question that the District Court's jurisdiction was properly invoked under 29 U.S.C. § 185(a). The question is whether, and to what extent, the District Court could enforce the arbitration award. This issue, really the focal issue in this case, will be dealt with in Part IV, *infra*, but we conclude that the District Judge properly dealt with this branch of Standard's challenge to its jurisdiction.

### B. *The IAM as a party which must be joined if feasible*

Standard's second attack on the District Court's subject matter jurisdiction comes in the form of its defense that the IAM is a party which must be joined under Rule 19(a) of the Federal Rules of Civil Procedure.[4] Standard claims that the IAM has a direct, substantial, pecuniary interest in the instant proceedings and that the IAM's ability to protect that interest would be substantially impaired by a decision to enforce the award of Arbitrator Morris. In

---

*Garner* line of cases and refused to find preemption. Even as clarified, these cases do not control the result here.

**3.** See also *Sears, Roebuck, supra*, n. 2, — U.S. at — n. 14, 98 S.Ct. 1745; *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 298–300, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); *Carey v. Westinghouse*, 375 U.S. 261, 268, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); *Smith v. Evening News Ass'n*, 371 U.S. 195, 197-98, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); *Atkinson v. Sinclair Rfg. Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962).

Somewhat more relevant to Standard's contention is the case of *South Prairie Construction Company v. Local No. 627*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976). In that case the court of appeals, on review of an NLRB order holding that two companies were "separate" employers, concluded that those two companies were actually a "single" employer within the meaning of the NLRA and that their employees constituted a single appropriate unit for collective bargaining purposes. The Supreme Court reversed, stating that "the selection of an appropriate bargaining unit lies largely within the discretion of the Board, whose decision 'if not final, is rarely to be disturbed', . . ." *Id.*, at 805, 96 S.Ct. at 1844. The instant case, of course, is not a direct review of such an NLRB decision, but

Standard seeks to apply *South Prairie*, saying that enforcement of the arbitrator's award would radically alter the status of the IAM as the certified bargaining representative of its Denison plant employees. Again, this argument does not go to the *jurisdiction* of the district court, but rather to the *merits* of the dispute.

**4.** Fed.R.Civ.P. 19(a):

(a) *Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

addition, Standard claims that it would be subject to a very real and substantial risk of incurring inconsistent obligations to the Teamsters and the IAM. The District Judge found the issue of nonjoinder "troublesome", but he nevertheless ruled against Standard on this point (although he did dismiss the complaint on other grounds).

The IAM, as the sole and exclusive bargaining agent for all the Denison production and maintenance employees certainly has a not insubstantial interest in the maintenance of its contractual right, backed by the imprimatur of the NLRB, to bargain with Standard over wages, hours, and working conditions at the Denison plant. To enforce those rights, the IAM can resort to the filing of unfair labor practice charges with the NLRB, or it may resort to the grievance and arbitration machinery specified in its contract with Standard, just as the Teamsters have done in this case pursuant to their contract with Standard at the Dallas plant. Nevertheless, if this Court should hold that the arbitration award in its entirety must be enforced, the IAM surely will have had its ability to protect its interests impaired or impeded, despite the existence of such channels for processing its grievances.

For its part, Standard certainly faces a substantial risk that it will incur inconsistent obligations by reason of a failure to join the IAM. As the arbitrator himself recognized, the NLRB's jurisdiction would likely be invoked if Standard agreed, or was ordered by a court of competent jurisdiction, to abide by the arbitrator's award. Furthermore, the IAM might invoke the arbitration machinery of its contract, with results that are totally unpredictable. Compare *Window Glass Cutters League v. American St. Gobain Corp.,* 3 Cir. 1970, 428 F.2d 353 (action to order arbitration dismissed where refusal to join additional union might leave company subject to conflicting arbitration awards). Despite these serious risks, this Court cannot be blind to the fact that Standard appears to have brought much of this risk upon itself. Standard signed the Teamsters contract granting certain rights to its Dallas employees. It was Standard which erected a new plant 75 miles from Dallas, a plant fully designed and equipped to handle the same type of operations as its Dallas plant. It was Standard which refused repeated Teamsters requests for information on its intentions with respect to its new plant. It was Standard which agreed to submit the dispute concerning transfer rights to binding arbitration. Finally, it was Standard which then decided to close the Dallas plant and announced that intention before the arbitrator had rendered his decision, all the while asserting that it did not intend to transfer its Dallas operations to Denison. With this pattern of activity laid bare upon the record by the arbitrator's findings, to the admission of which Standard did not object and which the District Judge recognized that he was "not at liberty to retry . . . .", there is something anomalous about Standard's assertion that this entire action must be dismissed because *it* may be subject to a risk of incurring inconsistent obligations sometime in the future.

On the other hand, there is reason to suspect the Teamsters' motivation in refusing to make the IAM a party. We are not unmindful of the jealouses and rivalries which exist between unions, particularly in cases such as this where one union stands to gain members at the expense of the other. Throughout the litigation, the Teamsters have asserted that they do not challenge the IAM's certification by the NLRB and that they only seek to enforce the contractual rights of their members. When this suit began, the Dallas bargaining unit was seemingly larger than the Denison unit, so there was an outside chance that the Teamsters, if they could transfer enough of their members to Denison, might eventually become the bargaining representative. This possibility now seems remote. The Denison work force is now considerably larger than it was at the time the initial election was held, and the IAM has presumably signed a

new contract with Standard, since the old contract was to expire on June 11, 1978.

As can be seen from the foregoing, this issue of joinder under Rule 19(a) is far from simple, but we think that its resolution is inextricably linked with what we perceive as the central issue in this case—whether a federal district court can enforce the remedial provisions of an arbitration award which would require the employer to violate the terms of another collective bargaining agreement. Because of the manner in which we resolve this issue, *infra,* we do not reach the Rule 19(a) objection of Standard.[5]

## IV. ENFORCEABILITY OF THE ARBITRATION AWARD

The District Court declined enforcement of the arbitrator's award on the ground that to do so would present an irreconcilable conflict with the NLRB's certification of the IAM as the exclusive bargaining agent for the Denison employees. Standard asserts that enforcement would impinge upon the rights of the Denison employees to bargain collectively with respect to rates of pay, wages, hours of employment, and other conditions of employment, as guaranteed them by §§ 7 and 9(a) of the National Labor Relations Act, 29 U.S.C. §§ 157, 159(a).[6] Denison employees would suddenly be paid different (and, most likely, lower) wage rates and benefits for the same work. They would become junior to the transferees from Dallas even though they possessed greater plant seniority than the transferees. The nub of the dispute is that if this Court directs enforcement of the arbitrator's award, it may be affirmatively causing the employer to be ordered to commit an unfair labor practice under 29 U.S.C. § 158(a)(1).[7] This cannot be done.

The starting point of our inquiry is, of course, the seminal decision in *Textile*

---

**5.** Standard also asserts that consideration of the claims presented by the Teamsters is barred by the doctrine of *res judicata.* However, it cites no authority for this position and we are unable to find that the question of the enforceability of this arbitration award is barred by any prior judgment rendered by a court of competent jurisdiction, which judgment was final, on the merits, and involved the same cause of action. See *Hall v. Tower Land and Investment Company,* 5 Cir. 1975, 512 F.2d 481.

**6.** 29 U.S.C. § 157:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
29 U.S.C. § 159(a):
Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employ-

ment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment.

**7.** 29 U.S.C. § 158:
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
* * * * * *
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .
Under (a)(3), disparate wage treatment for the forbidden purpose of encouraging or discouraging union membership is clearly proscribed. *Radio Officers' Union of Commercial Telegraphers Union v. NLRB,* 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). If this Court enforced the arbitrator's award, presumably it would be difficult for the NLRB to find the necessary discriminatory intent on the part of Standard, especially since it has resisted enforcement so vigorously. However, we certainly express no opinion as to whether enforcement of this

*Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), where the Supreme Court held that § 301 authorized the courts to fashion a body of federal common law for the enforcement of collective bargaining agreements and, more specifically, the enforcement of promises to arbitrate. Four years later, in the "Steelworkers Trilogy", the Court further shaped that body of federal common law by endorsing arbitration as the preferred method of settling grievances arising from collective bargaining agreements. *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In the latter case, the Court specifically addressed the question of a court's proper role in reviewing an arbitrator's interpretation of provisions of a collective bargaining agreement: "his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." 363 U.S. at 597, 80 S.Ct. at 1361. Further, in *Carey v. Westinghouse Electric Corp.,* 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964),

a case cited extensively by the parties here, the Court endorsed arbitration as a means to solve either work assignment or representation disputes, even though the NLRB could entertain unfair labor practice charges if the dispute were over representation. The Court also noted that the arbitration procedure must have been fair and the results "not repugnant" to the National Labor Relations Act. 375 U.S. at 271, 84 S.Ct. 401. In addition, if the NLRB were to rule contrary to the arbitrator, the Board's ruling would take precedence. *Id.* at 272, 84 S.Ct. 401. See also *New Orleans Typographical Union v. NLRB,* 5 Cir. 1966, 368 F.2d 755, 767. Presumably, in such a case, the system of "private law," *Warrior & Gulf Navigation Co., supra,* 363 U.S. at 581, 80 S.Ct. 1347, must yield to the system of public law expressed in the NLRA and administered by the NLRB.

 Thus, there *must be* : (1) an agreement to arbitrate and the parties must be covered by that agreement; (2) an award which draws its "essence" from the agreement and does not exceed the scope of the issues presented to the arbitrator; and (3) an award which is not "repugnant" to the NLRA.[8] There is no dispute in this case that item 1 is present; there was a valid, binding agreement which covered both Standard and the Teamsters. Standard

---

award in the circumstances of this case would constitute an unfair labor practice in violation of 29 U.S.C. § 158(a)(3). That is a task for the Board.

8. Other cases have added slightly to these basic requirements. An award may be vacated where it is shown that there was fraud, partiality or other misconduct on the part of the arbitrator, see, *e. g. Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 201 (1968); or because the award was too vague or ambiguous for enforcement, see, *e. g., United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Bell Aerospace Co. Division of Textron, Inc. v. Local 516, UAW,* 2 Cir. 1974, 500 F.2d 921, 923; *Hanford Atomic Metal Trades Council, AFL-CIO v. General Electric Co.,* 9 Cir. 1965, 353 F.2d 302; or where the award conflicted with the demands of a statute, see *Banyard v.*

*NLRB,* 1974, 164 U.S.App.D.C. 235, 505 F.2d 342 (award authorizing company to violate state law held void as against public policy); *Associated Milk Dealers, Inc. v. Milk Drivers Local 753,* 7 Cir. 1970, 422 F.2d 546, 553 (arbitration would not be ordered if clause to be interpreted violated antitrust laws); *Nursing Home Union Local 1115 v. Hialeah Convalescent Home,* 348 F.Supp. 405, 411 (S.D.Fla.1972) (conflict with national wage-price control policy). Standard argues that the arbitrator's order requiring the payment of "compensation and other benefits" at the Dallas rate to any transferee is too vague to be enforceable. Because we hold that differential benefits cannot be a part of the award, there is no necessity to decide this issue. On the remand, however, the arbitrator should specify the monetary award which he determines to be equivalent to the difference between the benefits paid under the Dallas and Denison contracts.

claims that the second criterion has not been met, *i. e.*, that the arbitrator's award did not draw its essence from the contract. We think, however, that if the Denison plant had not been organized prior to the award, it would have been readily enforceable in its entirety against Standard. Therefore, we cannot say that the award exceeded the four corners of the contract. Cf. *Local 369, Bakery & Confectionery Workers International Union of America v. Cotton Baking Co., Inc.*, 5 Cir. 1975, 514 F.2d 1235, *cert. denied*, 423 U.S. 1055, 96 S.Ct. 786, 46 L.Ed.2d 644 (1976). Unfortunately for the Teamsters, however, the Denison plant had been organized by the IAM, which was then certified as the bargaining agent by the NLRB. This fact, then, narrows the issue to compliance with the third criterion.

We think that the award was "repugnant" to the NLRA and accordingly affirm the District Judge on that point.

The right of employees to bargain collectively is at the heart of our federal policy governing labor management relations. Unions are vitally concerned, and properly so, with their right to bargain over wages, benefits, seniority and working conditions. Section 9(a) of the NLRA expressly recognizes such a right for a union if it is certified by the NLRA. If a contract or an arbitration award conflicts with that policy, the statutory policy must prevail. We think that a contract specifying that an employee transferring to another plant operated by the same employer would continue to receive the same wages and benefits that he received at the old plant, despite the existence of a contract with another union at the new location, would be unenforceable. It necessarily follows that an arbitration award which seeks to achieve the same impermissible result cannot be enforced.

Decisions of three other courts of appeals support this analysis. In *Sperry Systems Management Division, Sperry Rand Corp. v. NLRB*, 2 Cir. 1974, 492 F.2d 63, *cert. denied*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1976), the Second Circuit was faced with a situation similar to that before us. A union representing a New York unit sought, through arbitration, to have its entire contract applied to a small unit in California, where three draftsmen performing work similar to that done in New York were receiving lower wages. The arbitrator ordered the application of all terms of the prior contract (except the representation provision) to the new bargaining unit. The company resisted the award and filed a complaint with the NLRB charging that the union's attempt to enforce the award amounted to an unfair labor practice. A divided NLRB dismissed the company's complaint, but the Second Circuit reversed, finding that the union's activities constituted a *sub rosa* attempt to gain recognition as the bargaining agent for the California workers, who had previously rejected that union in an election conducted by the NLRB. Furthermore, the union had "committed an unfair labor practice because the subject of the wages and working conditions of the Vallejo employees was not a permissible subject of bargaining in the New York City unit". 492 F.2d at 69.

The Seventh Circuit reached a similar conclusion in *Local 7–210, Oil, Chemical & Atomic Workers v. Union Tank Car Co.*, 7 Cir. 1973, 475 F.2d 194, *cert. denied*, 414 U.S. 875, 94 S.Ct. 68, 38 L.Ed.2d 120. In that case, an arbitrator had ordered Union Tank Car Co. to apply its agreement with the OCAW to certain operations once performed by the OCAW but subsequently transferred to a plant covered by a contract with another union, the Boilermakers. The court denied enforcement.

The court felt that the NLRB's certification of the Boilermakers as exclusive bargaining agent precluded application of the OCAW contract at the second plant. Finding no breach of contract at all, the court also declined to enforce the arbitrator's order that the company make the OCAW–represented employees whole for any lost wages or monetary fringe benefits.

Finally, the Fourth Circuit in *Glendale Manufacturing Co. v. Local No. 520, ILGWU,* 4 Cir. 1960, 283 F.2d 936, *cert. denied,* 366 U.S. 950, 81 S.Ct. 1902, 6 L.Ed.2d 1243 (1961), refused to enforce an arbitration award ordering the employer to bargain with a decertified, minority union. Judge Haynsworth, writing for the court, concluded that "the employer should not be forced to commit an unfair labor practice by dealing with the union as the representative of the employees". 283 F.2d at 940. The court, however, was not unmoved by the plight of the employees and remanded the case to the arbitrator to fashion a new award, which would not cause the employer to commit an unfair labor practice, and suggested that ordering the employer to negotiate directly with the individual employees might be proper.

We find the reasoning of these cases persuasive. Although the union here has consistently disclaimed any attack on the IAM's certification, its repeated appeals to the NLRB on the certification issue indicate otherwise. In fact, at oral argument, counsel for the Teamsters, perhaps realizing that its position was becoming less tenable, suggested that possibly the best resolution of this case would be to remand to the arbitrator for a determination of lump sum damages.

In its brief, the Teamsters cite authority to indicate that contractual provisions such as those at issue in this case have become a common feature in collective bargaining agreements nationwide. The movement of plants from one location to another, the transfer of functions between plants, and the movement of workers between plants

are subjects of vital concern for both labor and management. Employees are interested in continuity of employment, income, and seniority rights. Employers, on the other hand, need flexibility to respond to competitive forces and to increase efficiency. Such agreements are important, perhaps necessary, features of the modern mixed economy and are entitled to be respected. But when one contract conflicts with the overriding statutory policy of the NLRA, it cannot be enforced through specific performance. To do so would, to an unacceptable degree, interfere with the equally important right of other workers to organize themselves into a union and bargain collectively with their employer.

■ Therefore, we cannot direct enforcement of the arbitrator's award, but, like the District Judge below, we are "not unmoved by the employees' situation". We also accept the findings of the arbiter and we do not condone the company's conduct. It is noteworthy that Standard itself does not deny the contractual violations; it asserts that *this* award cannot be enforced. We agree, but we are unwilling to agree that the choice is an on-off, all-or-nothing one. In *Lincoln Mills, supra,* the Supreme Court declared that the courts must fashion federal common law from the policy of the national labor laws and that "[t]he range of judicial inventiveness will be determined by the nature of the problem". 353 U.S. at 457, 77 S.Ct. at 918. We believe that that federal common law requires us to vacate the arbitrator's award but it also permits us to remand for the reformulation of an award in damages. See *Glendale Mfg. Co., supra,* 283 F.2d at 940- 41.[9] Since, in his

---

**9.** We note that the same result could be reached under the United States Arbitration Act, 9 U.S.C. §§ 1- 14. Section 10(d) provides that the district court may vacate the award "where the arbitrators exceeded their powers", and § 10(e) grants the court discretion to direct a rehearing by the arbitrators "where àn award is vacated and the time within which the agreement required the award to be made has not expired . . . ." Further, § 11(b) authorizes the court to modify or correct the award

"where the arbitrators have awarded upon a matter not submitted to them . . . ."

Some doubt as to the applicability of the Arbitration Act to disputes arising from collective bargaining agreements was created by the Supreme Court in its decisions in *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), and *General Electric Co. v. Local 205, United Electrical Workers,* 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957). The majority opinions did not discuss the appli-

award, the arbitrator stated that he would retain jurisdiction, we think that the best course here would be to allow him the first opportunity to calculate lump sum damages and to compute a lump sum damage award. He may, of course, consider lost wages, vacations, pension benefits and other such entitlements in fixing his damage award. The fact that the contract which was breached was due to expire April 30, 1976, is controlling as to the period for which damages may be awarded. Nothing in that contract could have created an expectation that the employees would have continued to enjoy the same wages and benefits beyond the expiration of the contract. Since Standard originally offered to allow the Dallas employees to transfer to Denison we assume that it can still find equivalent jobs for any Dallas employees who may yet wish to transfer at this late date, if indeed there are any. Regardless of whether those employees now wish to transfer they are entitled to damages, to be ascertained and computed according to law.

## CONCLUSION

To be specific, we are of the opinion that the courts may not enforce that part of the arbitrator's award which grants to Dallas employees who desire to transfer to Denison superseniority as though they had commenced work at Denison on "the first working day any production or maintenance employee began work in Denison". This is in direct and irreconcilable conflict with the rights of the Denison employees, under NLRA, to be represented by IAM, and, through it, to negotiate and contract for wages and working conditions at Denison. The effects of seniority at that facility involve not only Standard Brands and its Dallas employees. Indeed, outside control

cability of the Act, but Justice Frankfurter in dissent regarded the majority opinions as implicitly rejecting "the availability of the Federal Arbitration Act to enforce arbitration clauses in collective bargaining agreements . . ." 353 U.S. at 466, 77 S.Ct. at 926.

The Supreme Court has not ruled on the issue since the *Lincoln Mills* case, however, and the courts of appeals have charted an uneven path. One immediate difficulty is created by the Act's injunction that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Most of the appellate courts which have dealt with this issue have limited this provision to those cases where the union or the employer is actually engaged in the transportation industry. See, e. g., *Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. General Electric Co.*, 2 Cir. 1969, 406 F.2d 1046. At least three circuits, the Second, Sixth and Seventh, have expressly held the Act applicable to suits involving the arbitration of collective bargaining disputes. See *Bell Aerospace Co. Division of Textron, Inc. v. Local 516, UAW*, 2 Cir. 1974, 500 F.2d 921, 923; *Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. General Electric Co., supra; American Broadcasting Companies, Inc. v. American Federation of Television and Radio Artists*, 412 F.Supp. 1077 (S.D. N.Y.1976); *Makress Lingerie, Inc. v. Int'l Ladies Garment Workers' Union*, 395 F.Supp. 110 (S.D.N.Y.1975); *Chattanooga Mailers v. Chattanooga News-Free Press*, 6 Cir. 1975, 524 F.2d 1305; *Pietro Scalzitti Co. v. Int'l Union of Op-*erating *Engineers, Local No. 150*, 7 Cir. 1965, 351 F.2d 576. At least three other circuits, including this Circuit, have recently held the Act applicable to disputes concerning the employment contracts of brokers and their brokerage firms. See *Dickstein v. duPont*, 1 Cir. 1971, 443 F.2d 783; *Tullis v. Kohlmeyer & Co.*, 5 Cir. 1977, 551 F.2d 632; *Legg, Mason & Co., Inc. v. Mackall & Coe, Inc.*, 351 F.Supp. 1367 (D.D.C.1972). The Third Circuit seems to have developed a conflict on the issue. *Compare Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 3 Cir., 397 F.2d 594, *cert. denied*, 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968), *with Ludwig Honold Mfg. Co. v. Fletcher*, 3 Cir. 1969, 405 F.2d 1123 (denying applicability) *and Local 719, American Bakery and Confectionery Workers of America v. National Biscuit Co.*, 3 Cir. 1967, 378 F.2d 918 (declining invitation to analogize to procedures of Arbitration Act). In the present posture of this case, where the parties have not invoked jurisdiction under the Arbitration Act nor briefed its relevance to the issues before us, we decline to rest our holding on the provisions of the Act and reserve that question for another day. Instead, we reach the same result by fashioning a remedy from the federal common law of labor relations, true to the mandate of *Lincoln Mills*. Cf. *Glendale Mfg. Co. v. Local No. 520, ILGWU*, 4 Cir. 1960, 283 F.2d 936, 940 ("Under the circumstances, it seems appropriate to refer the entire matter back to the arbitrator who may reframe the award in the light of subsequent developments.")

over seniority rights could deny the Denison employees the most valuable of all the rights protected by the negotiating-contracting process, i. e., the job itself. Moreover, it could also affect advancement, layoff, recall, and a multitude of other rights which the NLRA vests in IAM as the duly certified bargaining representative of Denison employees.

In denying enforcement of the award as presented, the District Court noted that "It would have been proper for the arbiter to order the company to pay money damages or to require the defendant to *hire* (emphasis added) Dallas employees".

We conclude that the Judgment of the District Court in declining to enforce the arbitrator's award as rendered should be affirmed.

We further conclude, however, that the case should be remanded to the arbitrator for a determination, after appropriate hearings, of any damages lawfully due the Dallas employees for the breach of their contract by Standard Brands, including the loss of seniority rights.

The case will be remanded for further proceedings not inconsistent herewith.

AFFIRMED and REMANDED.

TUTTLE, Circuit Judge, with whom WISDOM, GOLDBERG, ALVIN B. RUBIN and VANCE, Circuit Judges, join, concurring in part and dissenting in part:

As an alternative course of action to that which I have recommended below, I concur in the majority's remand of the arbitrator's award for a reformulation in the form of lump sum damages. I respectfully dissent from its affirmance of the district court's refusal to enforce the arbitrator's award. I do not feel that the award conflicts with the NLRB certification of the IAM, or that it would require Standard to violate the terms of its agreement with the IAM, therefore, I would reverse the district court's denial of enforcement.

Prompted by the delicate nature of this area of the law, where judicial power and NLRB authority sometimes overlap and potentially conflict, the majority has perceived a conflict between the courts and the NLRB that I do not detect. Both the district court and the majority conclude that the arbitrator's award could not be enforced due to an "irreconcilable" conflict between the terms of that award and the NLRB certification of the IAM. The NLRB, however, has not declared enforcement of the award to be an unfair labor practice. Thus, the district court and the majority have reached their own conclusion concerning the impact of the award upon the IAM certification.

The majority opinion states that "the nub of the dispute is that if this Court directs enforcement of the arbitrator's award, it *may be* affirmatively causing the employer to be ordered to commit an unfair labor practice under 29 U.S.C. § 158(a)(1)," and (3) (emphasis added). This obviously could not be done. However, the majority goes on to explain in its footnote seven that "if this Court enforced the arbitrator's award, presumably it would be difficult for the NLRB to find the necessary discriminatory intent on the part of Standard" to prove a section 158 unfair labor practice. Further, the footnote disclaims any opinion as to whether enforcement of the award *would* constitute an unfair labor practice at all, quite accurately explaining that such decisions are a task for the Board.

After glossing over this serious charge that compliance with the award could cause Standard to commit an unfair labor practice, the majority then turns to the landmark cases of *Lincoln Mills* and the "Steelworkers Trilogy" in search of a basis for this "irreconcilable" conflict. From these cases the majority distills a three pronged test for the enforcement of the arbitration award and finds that it fails to comply with the third criterion, because it is "repugnant" to the NLRA. The majority explains that the right of employees to bargain collectively is the essence of our federal policy governing labor management relations, and

correctly states that if an arbitration award conflicts with that policy, the statutory policy must prevail. The breakdown in this rationale lies in its failure to explain with precision the manner in which this award is repugnant to the federal policy encouraging collective bargaining. The only support of this position I can find is when the majority quotes the language of the district court:

> The arbiter clearly recognized that his award would lead to employee frictions that the NLRB would oversee. It would have been proper for the arbiter to order the company to pay money damages or to require the defendant to hire the Dallas employees, but he took the further step of specifying wages and working conditions *after* the NLRB had certified the IAM as the exclusive bargaining agent for the Denison unit. That certification has now withstood an appeal to the NLRB. It is the court's opinion that the arbiter's action in this regard conflicts with NLRB certification.

Although I do not believe the majority would find that the "irreconcilable" conflict would arise merely from the creation of "employee friction," that seems to be the only basis for its determination that the award is repugnant to the NLRA.[1] This is especially clear to me since the opinion states quite clearly that the same dollar amounts could have been awarded to the victims if couched in different terms.

I recognize that an influx of Dallas Teamsters, paid at higher rates than their Denison counterparts, could potentially have caused jealousy and conceivably eroded the IAM's strong support at the Denison plant, but I do not believe that this would amount to an unfair labor practice or that it would create a conflict with the NLRB so severe as to preclude enforcement of the arbitrator's award—a process equally significant in the proper operation of the collective bargaining system. *See, e. g., United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

I believe that if the arbitrator's decision is viewed as essentially a make-whole award, the damaging conflict perceived by the majority is minimized. As the district court and the majority opinion suggest, the arbitrator could have validly ordered the company to pay a lump sum damage award. If the lump sum is calculated on the basis of the difference in the Dallas and Denison wage scales, then the difference between the award of wages and the lump sum seems to be more a matter of form than substance. Although the award may have created some friction if it had been paid as a "Dallas wage" in Denison, I do not believe this would have required Standard to violate its agreement to bargain with the IAM, as stated by the majority. While I am concerned with the ambiguity of the arbitrator's language, I feel the uncertainties can be cleared up on remand. The ambiguity is certainly not a sufficient reason to refuse to enforce the award. Clearly, the arbitrator's intent was to make the Dallas employees whole for any losses they may have suffered. Thus, I believe it can be fairly argued that if lump sum damages are appropriate, then the arbitrator's order of "wages and other benefits" for the transferees in accordance with the Dallas contract can be modified on remand to avoid any conflict with the NLRB.

1. In taking the position that the award is unenforceable because of the application of Dallas wages and benefits to the Denison plant, the majority finds support in several decisions of other courts of appeals. I am not persuaded that this gives rise to a fatal conflict with the NLRA, but I have nothing to add to the discussion of these cases other than that stated in the panel opinion. *General Warehousemen and Helpers Local 767 v. Standard Brands, Inc.,* 560 F.2d 700, 707 (5th Cir. 1977).

Most significantly, I feel that it is a grave mistake to withhold enforcement of the arbitrator's award without a clear showing that it is repugnant to our national labor policies. By affirming this denial, the majority was forced to accept the trial court's construction of the NLRA as to what may constitute an unfair labor practice, a task which is properly reposed in the NLRB. If the court had enforced the award, any inconsistency with the Act or conflict with the Board's certification of the IAM could have then been tested in an unfair labor practice proceeding, with, of course, an appeal to this Court.

I would reverse the trial court's refusal to enforce the award and remand for that court to construe and enforce it. In the event the court could not adequately interpret the award, I, of course, would agree with the majority that the matter should be remanded to the arbitrator for a clarification and perhaps a reformulation.